OPINION OF THE COURT
Michael D. Stallman, J.
In this CPLR article 78 proceeding, petitioner Grevirlene Kersellius seeks a judgment annulling the determination of respondents William J. Bratton and the Board of Trustees of the Police Pension Fund, Article II, which denied petitioner’s application for a line-of-duty accident disability retirement (ADR) allowance. Petitioner also seeks an order directing respondents to retire her with an ADR allowance retroactive to the date of her service retirement. Alternatively, petitioner seeks an order remanding the matter to the Board of Trustees of the Police Pension Fund, Article II for further consideration.
Background
The petition alleges that, on June 20, 2010, Kersellius, who was then an 18-year veteran of the New York City Police Department (NYPD),[1] was about to end her shift when she heard a police radio report that there was an armed murder suspect at large. Kersellius volunteered to investigate and selected Police Officer James Atkins to be her driver. While in the patrol car, Kersellius and Atkins were directed, by radio, to a subway station at West 96th Street and Broadway. When the patrol car came to a stop at the subway entrance, Kersellius felt a pain in her neck, began feeling light-headed and developed a severe headache. Atkins and Kersellius exited the patrol car and Atkins noticed Kersellius holding her neck and heard her complaining of being light-headed. Atkins rushed Kersellius to St. Luke’s Roosevelt Hospital as she lost con *937 sciousness. In the early morning hours of June 21, 2010, Kersellius was admitted to the hospital where she was diagnosed with a ruptured aneurysm[2] and brain hemorrhage (petition ¶ 6).
On July 7, 2010, Kersellius was discharged from St. Luke’s Roosevelt Hospital and was admitted to Helen Hayes Hospital for inpatient rehabilitation. Upon her admission to Helen Hayes, a board-certified neurologist found that Kersellius suffered from cognitive, mobility and self-care deficits. She was discharged from Helen Hayes on July 21, 2010 and continued to receive therapeutic and rehabilitative services at home (id., exhibit D).
In January 2011, Kersellius received a neuropsychological evaluation. The examination revealed a “diffuse pattern of cognitive impairment, with deficits in attention, processing speed, episodic memory, construction, language, and planning. Behavioral presentation was notable for psychomotor slowing and blunted affect” (id., exhibit E).
In March 2012, Kersellius filed an application for accident disability retirement, relying upon General Municipal Law § 207-k (the Heart/Stroke Bill). By application dated July 2, 2012, respondent Bratton, as Police Commissioner, submitted an application to determine whether petitioner should be retired for ordinary disability retirement (ODR).[3]
On August 8, 2012, the Police Pension Fund Medical Board (Medical Board) considered petitioner’s application. After an interview and physical exam, the Medical Board found that Kersellius was disabled from performing full police duty, but concluded that petitioner’s cerebral aneurysm was a congenital abnormality, which spontaneously ruptured. (Petition, exhibit G.) The Medical Board recommended that the Board of Trustees deny Kersellius’s application for ADR and approve the Police Commissioner’s application for ODR (id.).
Thereafter, in a letter dated December 10, 2012 to Sergeant Gary DeRosa, a member on the Board of Trustees, petitioner’s attorney challenged the Medical Board’s recommendation on *938 the grounds that: (1) the Medical Board failed to identify any basis for its determination that the aneurysm was congenital; (2) the Medical Board failed to address the presumption in the Heart/Stroke Bill; (3) the Medical Board failed to come forward with competent evidence to rebut the presumption under the Heart/Stroke Bill; and (4) the medical literature identifies several causes for a stroke including high blood pressure that may be caused by strong emotions, such as being upset and angry (petition, exhibit H).
On March 27, 2013, the Medical Board reconsidered petitioner’s ADR application and, upon review, reaffirmed their previous position recommending that the Board of Trustees deny ADR. In that recommendation, the Medical Board cited to one article published by the National Institute of Neurological Disorders and Stroke that petitioner’s attorney provided in his December 10, 2012 letter. The article listed several possible causes of a brain aneurysm[4] and the Medical Board discounted all of the causes listed in that article stating that there was no evidence that petitioner suffered head trauma and there was no history of high blood pressure, infections, atherosclerosis, vascular disease, cigarette smoking or drug abuse. The Medical Board concluded, “[therefore, the aneurysm was congenital and underwent spontaneous rupture causing subarachnoid hemorrhage with sequelae, and we offer this as evidence to rebut the presumption of the stroke bill” (id., exhibit I).
By letter dated July 15, 2013, petitioner’s attorney wrote again to Sergeant DeRosa on the Board of Trustees, objecting to the Medical Board’s recommendation on the ground that the Medical Board did not base its determination on competent evidence and that it ignored a significant portion of the evidence that petitioner submitted which did not support the Medical Board’s position (petition, exhibit K). The Board of Trustees referred the matter back to the Medical Board.
On September 25, 2013, the Medical Board conducted its final review of petitioner’s ADR application, and reaffirmed its prior position. In that final review, the Medical Board cited a *939 hospital record which, in contradiction to other records,[5] states that petitioner developed “the worst headache of her life (10 out of 10) associated with neck pain” at 10:15 p.m. (petition, exhibit L), which would have been over an hour before she responded to the radio call of an armed suspect. The Medical Board found that such documentary evidence therefore indicated that petitioner’s aneurysm ruptured “before the line of duty incident” (id.).
In a December 9, 2013 letter to Sergeant DeRosa, petitioner’s attorney requested that the Board of Trustees “upgrade [her] application to ADR under the Stroke Bill” (id., exhibit M). Petitioner’s attorney argued that
“The Medical Board wrongfully referred to a handwritten portion of the Sergeant’s St. Luke’s-Roosevelt Hospital Center Emergency Room records to support their concocted fact pattern. The handwritten time of 10:15 p.m. is obviously a clerical error, because the Progress Note rightfully states that Sgt. Kersellius had to be rushed directly to St. Luke’s-Roosevelt Hospital Center for emergency care by P.O. Atkins after she suffered her brain aneurysm and became symptomatic. The Medical Board ignored the portion of the Progress Note which indicated: ‘Developed worst headache of her life (“Ten out of Ten”) associated [with] neck pain. Her officer partner noticed lethargy & brought her to St. Luke’s Hospital’ ” (id.).
On February 12, 2014, the Board of Trustees, by a six-to-six tie vote, denied petitioner’s ADR application[6] (id., exhibit N). This article 78 petition followed.
*940 Discussion
“An applicant for ADR benefits ‘has the burden of establishing that the disability is causally connected to a line-of-duty accident’ ” (Matter of Doorley v Kelly, 106 AD3d 554, 554 [1st Dept 2013] [citation omitted]). However, the Heart/Stroke Bill creates a presumption that any health condition caused by either heart disease or by a stroke and resulting in disability to a paid member of the uniformed force of a paid police department is the result of an accidental injury, and that the injury was received in the performance of official duties[7] (see Uniformed Firefighters Assn., Local 94, IAFF, AFL-CIO v Beekman, 52 NY2d 463 [1981]).
“[T]he theory behind the bill, as outlined by its proponents, is not only that heart conditions are an occupational hazard for police officers and firemen, but also that this is a unique condition which generally is not the result of any particular incident but involves a gradual and progressive degeneration as a result of the continuous stress and strain of the job” (id. at 471).
The statute provides that the presumption may be overcome by competent evidence to the contrary (General Municipal Law § 207-k [a]; Matter of Richter v Kelly, 111 AD3d 538, 538 [1st Dept 2013]). “It [is] the sole province of the Medical Board and the Board of Trustees, not the court, to resolve conflicts in the medical evidence” (Matter of Goodacre v Kelly, 96 AD3d 625, 626 [1st Dept 2012]). “[C]ourts cannot weigh the medical evidence or substitute their own judgment for that of the Medical Board” (Matter of Appleby v Herkommer, 165 AD2d 727, 728 [1st Dept 1990]).
Here, it is undisputed that petitioner was entitled to a presumption under the Heart/Stroke Bill. Petitioner therefore would be entitled to ADR benefits as a matter of law unless the *941 presumption were rebutted. (Matter of Liston v City of New York, 161 AD2d 491, 492 [1st Dept 1990].)
The vast majority of cases concerning the presumption of the Heart/Stroke Bill involves heart conditions. For heart conditions, the case law is well-settled as to situations where the presumption is rebutted:
1. for an idiopathic heart condition, i.e., one of unknown cause, the presumption is rebutted when the heart condition is unaccompanied by coronary artery disease or hypertension[8] (Matter of Goldman v McGuire, 101 AD2d 768 [1st Dept 1984], affd 64 NY2d 1041 [1985] [idiopathic ventricular hypertrophy, because no coronary disease, vital signs in normal limits]; Matter of Vallas v Safir, 304 AD2d 353 [1st Dept 2003] [idiopathic dilated cardiomyopathy unaccompanied by coronary artery disease or hypertension]; accord Matter of Wholihan v Vanessen, 254 AD2d 492 [2d Dept 1998] [mild cardiomyopathy]);
2. the presumption is also rebutted if established medical knowledge demonstrates that the heart condition is congenital, viral, or only the result of a childhood disease, such as rheumatic fever (see Matter of Burns v Safir, 305 AD2d 142 [1st Dept 2003] [fibrillation was congenital]; Matter of Lo Pinto v Ward, 124 AD2d 497 [1st Dept 1986] [well-established medical fact that neither physical nor emotional stress causes mitral valve prolapse]);
3. the presumption is rebutted when medical knowledge establishes that the stress of police work cannot cause the heart condition at issue (Matter of Callaghan v Bratton, 253 AD2d 390 [1st Dept 1998] [no activity or function in the performance of police duties which can predispose or precipitate atrial fibrillation attacks]; Matter of Gumbrecht v McGuire, 117 AD2d 531 [1st Dept 1986]).
In sum, where the Medical Board has eliminated the possibility that the disabling heart condition was stress or job-related, the Heart/Stroke Bill presumption was rebutted. (See Matter of Lo Pinto, 124 AD2d at 498.)
By contrast, for strokes, there is a paucity of reported cases as to what medical evidence will rebut the presumption of the *942 Heart/Stroke Bill. Stroke was added to the statute in 2006, and the amendment was deemed effective as of January 1, 2002 (L 2006, ch 654, § 1). Matter of Hogg v Kelly (93 AD3d 507 [1st Dept 2012]), which respondents cite, appears to be the only reported case involving the presumption of the Heart/ Stroke Bill and a stroke.
In Matter of Hogg, the Appellate Division, First Department ruled that evidence that the petitioner’s ischemic stroke was “associated with” congenital heart defects was sufficient to rebut the statutory presumption of the Heart/Stroke Bill. In addition, the Appellate Division pointed to the opinion of the petitioner’s treating vascular neurologist, who opined instead that the stroke was of unknown origin. The Appellate Division, First Department stated, “A finding of unknown origin itself rebuts the statutory presumption that the disabling condition was incurred in the line of duty.” (Matter of Hogg, 93 AD3d at 508.)
Here, respondents argue that the Heart/Stroke Bill presumption was rebutted because petitioner’s stroke was unaccompanied by coronary artery disease or hypertensive heart disease (respondents’ mem at 3). Although prior cases held that the absence of coronary artery disease or hypertensive heart disease was sufficient to rebut the statutory presumption for an idiopathic heart condition, respondents have not shown, from a medical standpoint, that petitioner’s stroke is similar to a heart condition, and that the evidentiary showing in the cases involving heart conditions would therefore be sufficient to rebut the presumption in this stroke case. Indeed, as respondents point out, there are two kinds of stroke: (1) an ischemic stroke, caused by a blood clot that blocks or clogs a blood vessel in the brain, and (2) a hemorrhagic stroke, which is caused by a blood vessel that breaks and bleeds into the brain (respondents’ mem at 2 n 2). It is undisputed that petitioner suffered a hemorrhagic stroke, not an ischemic stroke.[9]
Respondents also indicate that the Medical Board concluded that petitioner’s cerebral aneurysm was congenital. Although competent evidence that a disabling heart condition is congenital is sufficient to rebut the presumption for a heart condition, evidence that petitioner’s cerebral aneurysm is congenital is insufficient to rebut the Heart/Stroke Bill presumption for *943 stroke. The cause of the aneurysm does not explain its rupture, i.e., the stroke.
Matter of Hogg v Kelly is distinguishable from this case, because the stroke at issue in Matter of Hogg was an ischemic stroke, i.e., a stroke occurring as a result of a clot forming within a blood vessel. In Matter of Hogg, the Medical Board concluded that the stroke was most likely caused by a paradoxical embolism across a patent foramen ovale (Matter of Hogg v Kelly, 2010 NY Slip Op 31016[U] [Sup Ct, NY County 2010]). That is, the Medical Board believed that a clot likely traveled through a small hole between the two upper chambers of the petitioner’s heart, that the small hole was a congenital abnormality, and that the clot could have formed because the petitioner had an atrial septal aneurysm, a cardiac abnormality that was also congenital. Thus, in Matter of Hogg, the congenital abnormalities possibly explained not only the formation of the clot, but also how such a clot could have traveled to a blood vessel within petitioner’s brain, thus causing the ischemic stroke.
To the extent that respondents argue, as in Matter of Hogg v Kelly, that the statutory presumption was rebutted because petitioner’s stroke was “associated with” a congenital defect, i.e., the aneurysm, this argument presents the question of whether the Medical Board’s conclusion that the aneurysm was congenital was based on competent evidence.
After Matter of Hogg was decided, the Court of Appeals addressed the competent evidence standard in Matter of Bitchatchi v Board of Trustees of the N.Y. City Police Dept. Pension Fund, Art. II (20 NY3d 268, 282 [2012]), which involved the “World Trade Center presumption,” codified at Administrative Code of City of NY § 13-252.1 (1) (a).[10] In Matter of Bitchatchi, three police officers who spent more than 40 hours working *944 with recovery efforts at Ground Zero applied for ADR benefits due to cancer. Two of the three police officers, Karen Bitchatchi and Frank Macri, were diagnosed with cancer after working at Ground Zero. The third, Eddie Maldonado, felt a walnut-sized lump in his left thigh just prior to September 2001, but the cancerous mass grew to the size of a softball by November 2001.
The Medical Board recommended disapproval of all three applications. The Medical Board opined that Bitchatchi’s cancer was caused by a prior condition; that Macri must have had lung cancer before September 11, 2001 because of its advanced stage when it was diagnosed; and that exposure to toxins at Ground Zero could not have aggravated Maldonado’s cancer.
In all three cases, the Court of Appeals ruled that the World Trade Center presumption—that the officers’ cancerous conditions were caused by their exposure to toxins at Ground Zero— was not rebutted by any competent evidence. “[C]ompetent evidence . . . may be equated with the well-established credible evidence standard” (Matter of Bitchatchi, 20 NY3d at 282). The Court of Appeals stated,
“Credible evidence ‘is evidence that proceeds from a credible source and reasonably tends to support the proposition for which it is offered.’ Furthermore, ‘it must be evidentiary in nature and not merely a conclusion of law, nor mere conjecture or unsupported suspicion.’
“The legislature created the WTC presumption to benefit first responders because of the evidentiary difficulty in establishing that non-trauma conditions, such as cancer, could be traced to exposure to the toxins present at the WTC site in the aftermath of the destruction. Hence, unlike ordinary ADR claimants, first responders need not submit any evidence—credible or otherwise—of causation to obtain the enhanced benefits.
“Nevertheless, the legislature did not create a per se rule mandating ADR benefits for all eligible responders. Rather, it provided that a pension fund could rebut the presumption by ‘competent evidence.’ Under this carefully calibrated framework, we believe that the competent evidence contemplated by the WTC presumption may be equated with the well-established credible evidence standard, provided that the pension fund bears the *945 burden of coming forward with affirmative evidence to disprove causation. In other words, unlike the typical application for disability benefits, a pension fund cannot deny ADR benefits by relying solely on the absence of evidence tying the disability to the exposure.” (Id. at 281-282 [emphasis supplied and citations omitted], citing Matter of Meyer v Board of Trustees of N.Y. City Fire Dept., Art. 1-B Pension Fund, 90 NY2d 139 [1997].)
The Court of Appeals explained that, for Bitchatchi and Macri, the Medical Board’s conclusions were not supported by any credible source. For Bitchatchi, the Medical Board relied upon a single journal article to link Bitchatchi’s cancer with her prior medical condition, but the article itself did not support that conclusion. For Macri, the Medical Board’s conclusion that Maori’s cancer likely predated September 11, 2001 referenced “literature” regarding cancer doubling times and “copious data” as to survival times, but the Medical Board “failed to identify or include the specific literature or data upon which it relied, falling short of what is required by the statute” (id. at 282-283).
For Maldonado, the Court of Appeals found that the Board of Trustees did not satisfactorily rebut the presumption with credible evidence, because the Board of Trustees “focused on the equivocal nature of the evidence submitted by petitioner in his attempt to demonstrate that the cancer was aggravated by his WTC exposure” (id. at 284). The Court of Appeals explained that “in light of the presumption, petitioner carried no burden to offer any evidence of causation. Simply put, the Board could not rely on petitioner’s deficiencies to fill its own gap in proof” (id.).
Like the World Trade Center presumption, the presumption of the Heart/Stroke Bill is rebuttable by competent evidence. Applying the “competent evidence” standard of Matter of Bitchatchi to this case, the presumption of the Heart/Stroke Bill was not rebutted by competent evidence. The Medical Board concluded that petitioner’s aneurysm was congenital by ruling out other possible causes of the aneurysm. That is, the Medical Board found no history of hypertension, no infections or tumors, no vascular disease or atherosclerosis, no history of cigarette smoking, and no drug abuse. However, the conclusion of the Medical Board that petitioner’s aneurysm was congenital was based on conjecture; the conclusion assumes that the *946 causes of petitioner’s aneurysm that the Medical Board considered was an exhaustive list. Neither is there any explanation from the Medical Board, supported by a credible source, as to why the absence of these possible causes of petitioner’s aneurysm eliminated the possibility that petitioner’s stroke was stress or job-related (see Matter of Lo Pinto, 124 AD2d at 498; cf. Matter of Ploss v Kelly, 113 AD3d 531 [1st Dept 2014] [respondents failed to cite objective medical evidence to support the finding that decedent’s ventricular arrhythmia and tachycardia induced cardiomyopathy were not caused by job-related stress]).
Even if petitioner’s aneurysm were congenital, the Medical Board’s conclusion that “the aneurysm ruptured spontaneously” is not supported by any credible source, but rather is based on speculation. The Medical Board did not reference any literature or data to support its conclusion of a spontaneous rupture.
Much has been said about Kersellius’s severe headache, because a hospital record notes a different, earlier time of onset, preceding petitioner’s response to the radio call of an armed suspect, whereas other records appear to place the time of petitioner’s stroke around 11:30 p.m. Even if a severe headache were evidence that petitioner’s stroke began over an hour before the radio call, petitioner would still be entitled to a presumption of causation under the Heart/Stroke Bill. As discussed above, the proponents of the Heart/Stroke Bill believed that strokes, like heart conditions, “are an occupational hazard for police officers and firemen . . . which generally is not the result of any particular incident but involves a gradual and progressive degeneration as a result of the continuous stress and strain of the job.” (Uniformed Firefighters Assn., Local 94, IAFF, AFL-CIO, 52 NY2d at 471.)
Like Maldonado in Matter of Bitchatchi, the Board of Trustees’ focus on equivocal evidence that the stroke occurred earlier during petitioner’s shift (and perhaps during a less stressful moment) does not constitute competent evidence that would rebut the presumption that job-related stress caused petitioner’s aneurysm to rupture.
As respondents indicate, the Appellate Division, First Department stated in Matter of Hogg v Kelly (93 AD3d 507, 508 [1st Dept 2012]) that “[a] finding of unknown origin itself rebuts the statutory presumption that the disabling condition was incurred in the line of duty.” However, the court agrees *947 with petitioner that Matter of Hogg is contrary to the Court of Appeals’s decision in Matter of Bitchatchi, which was decided several months after Matter of Hogg. In essence, a finding that “we don’t know what caused the stroke” cannot satisfy the Board of Trustees’ “burden of coming forward with affirmative evidence to disprove causation” (Matter of Bitchatchi, 20 NY3d at 282; see also Matter of Ploss v Kelly, 113 AD3d 531 [2014]).
Conclusion
Respondents’ determination denying petitioner’s ADR application was arbitrary and capricious because they failed to present competent evidence sufficient to overcome the statutory presumption under General Municipal Law § 207-k. Petitioner is therefore entitled to ADR benefits as a matter of law.
Accordingly, it is adjudged that the petition is granted and the February 12, 2014 decision of respondents, William J. Bratton and the Board of Trustees of the Police Pension Fund, Article II, denying petitioner, Grevirlene Kersellius, a line-of-duty accident disability retirement allowance pursuant to General Municipal Law § 207-k is annulled; and it is further ordered and adjudged that William J. Bratton and the Board of Trustees of the Police Pension Fund, Article II are directed to retire petitioner Grevirlene Kersellius with an accident disability retirement allowance retroactive to the date of her service retirement; and it is further ordered and adjudged that petitioner do have and recover from respondents costs and disbursements.

. Prior to joining the NYPD, Kersellius passed all physical and mental examinations the Department administered and was found to be physically and mentally fit with no vascular impairments (petition ¶ 5).

. In this case, both petitioner and respondents agree that an aneurysm is a weak area in the wall of a blood vessel that enlarges or balloons (see petition, exhibit H; answer at 6 n 7). The parties also agree that a cerebral aneurysm may burst and bleed into the brain (id.).

. While both applications were pending, petitioner opted to retire for service retirement. The Pension Fund continued processing petitioner’s ADR application (answer ¶ 12).

. The article listed the following as possible causes of a cerebral aneurysm: (1) congenital; (2) trauma or injury to the head; (3) high blood pressure; (4) infection; (5) tumors; (6) atherosclerosis and other diseases of the vascular system; (7) cigarette smoking; and (8) drug abuse (id.).

. A progress note from records from St. Luke’s Roosevelt Hospital states, in relevant part: “41 YO RH 9 . . . WORKS AS A POLICE OFFICER WHO AT ~10:15PM LAST NIGHT (SHIFT’S TURNOVER) DEVELOPED WORST HEADACHE OF HER LIFE (‘TEN OUT OF TEN’)” (petition, exhibit C; respondents’ exhibit 5 at NYC 173). It is not clear from the record who provided the information to the examining physician.
The following records report the time of petitioner’s injury as occurring at approximately 11:30 p.m. on June 20, 2010: the police injury report; the report of injury to a department member; the patrol supervisor’s report; and the line-of-duty control log (petition, exhibit B).

. A tie vote by the Board of Trustees results in a denial of ADR (see Matter of Meyer v Board of Trustees of N.Y. City Fire Dept., Art. 1-B Pension Fund, 90 NY2d 139, 144-145 [1997]; see e.g. Matter of City of New York v Schoeck, 294 NY 559, 568-570 [1945]).

. General Municipal Law § 207-k (a) provides in pertinent part: “any condition of impairment of health caused by diseases of the heart, or by a stroke, resulting in total or partial disability or death to a paid member of the uniformed force of a paid police department or fire department, where such paid policemen or firemen are drawn from competitive civil service lists, who successfully passed a physical examination on entry into the service of such respective department, which examination failed to reveal any evidence of such condition, shall be presumptive evidence that it was incurred in the performance and discharge of duty, unless the contrary be proved by competent evidence.”

. If coronary artery disease and hypertension are present, the presumption might still be rebutted if the Medical Board finds that the coronary artery disease is non-obstructive and that the hypertension is of either recent origin, or mild, and unaccompanied by generalized or significant left ventricular hypertrophy (Matter of Knorr v Kelly, 35 AD3d 326, 327 [1st Dept 2006]; Matter of Pellicane v Kelly, 106 AD3d 558 [1st Dept 2013]; Matter of Goodacre v Kelly, 96 AD3d 625, 626 [1st Dept 2012]).

. Thus, this court does not address the issue of whether, for the purpose of the Heart/Stroke Bill, an ischemic stroke should be regarded as the same as a heart attack.

. Administrative Code of City of NY § 13-252.1 creates a presumption in favor of ADR benefits for police officers who performed rescue, recovery or cleanup work at specific locations after the 9/11 attacks. The statute states, in pertinent part:
“if any condition or impairment of health is caused by a qualifying World Trade Center condition as defined in section two of the retirement and social security law, it shall be presumptive evidence that it was incurred in the performance and discharge of duty and the natural and proximate result of an accident not caused by such member’s own willful negligence, unless the contrary be proved by competent evidence.” (Administrative Code § 13-252.1 [1] [a].)